Morning, Your Honors. This case involves a situation where an employee was fired, excellent employee, she'd been working there 15 years, gotten great reviews, no history of ever getting any write-ups, anything of that nature. And then she was fired. She can point to younger managers and supervisors doing the same thing. But I think... You say they're doing the same thing. Yes. Did they violate the code and also conceal their actions? Is that why they weren't fired? If she violated the code, then they most certainly did as well. But did they conceal their actions? In some cases, I think the issue is what they did, they did in open view, and then she does the same thing, and then she's accused of violating the code. But the problem is, if they're doing it in open view, how is she supposed to know that this is something she has to report? Well, I thought some of those e-mails were sort of telling between her and the other agent. That's just me. Well, before we can even get there, I think we've got a tremendous jurisdiction problem. So let me address that first. If I were to come in to you today and say, the counsel at that table are unscrupulous, have I just defamed them? I haven't listed them by name, but they're part of a small, identifiable group, and I've said something disparaging about them. Haven't I just defamed them? Hypothetically speaking, of course. If the answer is yes, this case has to go back to state court. The problem is that the particular defamation that happened in this case, or at least the first of many defamations, is that after my client was fired, but before Stephanie Warren was fired, Stephanie Warren was with Shirley Small. They were both, at that point, Fannie I heard from my wife that those people who were just fired were taking kickbacks. Hasn't he just defamed the people on that list as taking kickbacks? Case law says if you make defamatory statements about a small group of people that is identifiable, that's a defamation. Ms. Warren heard it, Mr. Donovan said it, it's a defamatory statement, he's a party, diversity, got to go back to state court. Now, he also says, can you give me a list of those people, because I want to give them to my wife over at Freddie Mac. Freddie Mac is the other big player in this industry. I want to give them to my wife, she's in hiring over at Freddie Mac, she wants to make sure none of these people ever comes to work at Freddie Mac. So he has now made a statement of intent, what he wants to do with people on that list of names. And sure as hell, I'm sorry, heck, what happens is my client goes over, she worked at Freddie Mac before, had great references, new people over at Freddie Mac, and she can't get a job over there because of the rumors circulating about her. In the industry. But was there a list, or just a rumor? Well that's the question. She didn't see the list being handed from Shirley Small to Mr. Donovan. So the implication is that Mr. Donovan got that information from Shirley Small, proceeded with his stated intent, under the Hillman Doctrine, when a person states an intent to do something in the future, it is some evidence that the person actually does what they stated they intend to do. Now, the district court action in saying there's diversity jurisdiction here is that because Ms. Warren, Ms. Warren was fired about a week later, Ms. Warren said, well I don't know if I was on that list. And when I heard that statement, I wasn't on the list because I hadn't been fired yet. And so the court said, well, if you're not on the list, you weren't defamed when Mr. Donovan made that statement, and you don't know whether he ever put you on the list or whether there was a supplement to the list. So that's not enough evidence to keep diversity in Ms. Warren's case. But Ms. Sandage had been fired at that point, or at least so we think. She's on the list. Mr. Donovan defamed her in front of And because he's a proper defendant, we've got diversity, and because there's diversity, he's got to go back to state court. So that's the immediate problem. Now, going to, if the court gets past that, if the court wants to talk about the merits, Ms. Sandage can point to other employees who were doing very similar things, younger employees, male employees, and yet they're not investigated, they're not fired or disciplined in any fashion. The classic example here, a younger male employee, Mr. Caperell, she's approached and asked about some of these transactions, and she says, well, you know, other people are doing the same thing. Mr. Caperell's doing the same thing. A year goes by, no investigation of Mr. Spinetto was providing some back office assistance. Before I get to the back office assistance, it had long been a practice that if you need more brokers in an area, you ask well-established brokers, hey, do you know anyone in the area, because I'm looking to add someone in the area. And Mr. Spinetto testified, you know, for a bunch of years, I would just, out of the niceness of my heart, I would help people, train them, get them on board in new areas. It was commonly asked of me. It was an expected practice for the REO brokers to make that request of me. And I finally decided, you know what, maybe I should make some money. Maybe I should turn this into a business. So Mr. Spinetto goes and talks to a vice president, Mr. Box, at Fannie Mae and says, hey, I've got a business idea for you. A lot of these real estate brokers out in kind of rural areas, they just don't have the wherewithal to meet all the rules and regulations that Fannie Mae requires. How about I provide them with some measure of back office support? We help them do their job better. And we help them, you know, dot the I's, cross the T's, so that Fannie Mae's business interests are protected. Not going to cost you a dime. We'll just help them out. And all of that, you know, all of that is worked out in the details between us and them. And Box said, yeah, that sounds like a great idea. So Box, in fact, thinks Spinetto is, you know, the greatest broker he's ever seen. He invites Box to be on a video with him. Video's posted on some sort of Fannie Mae site. It's not clear whether it's a public site or whether it's a private site. But he's now the model employee to show all the other people, such as Ms. Sandage, in terms of what's good and right. Well, it turns out that video was in Maryland. Mr. Spinetto's not licensed in Maryland. He's licensed in Virginia. So if it's completely improper for Mr. Spinetto to be doing any kind of work showing around people in Maryland because he's not licensed in Maryland, then why are they putting that up on a video as an example for him to do that? Mr. Spinetto had actually openly advertised back office services and these people were going to. Mr. Finch was also going out and openly advertising back office services. And the testimony is clear that until roughly August of 2012, no information, no training had been given to any of these people that any of that was improper. So why is there any problem of concealment if there's no training that what is going on is wrong? Now, the moment some question was raised about this, Ms. Sandage immediately goes to her manager and says, well, hey, I was doing this. Is there anything wrong with that? So the evidence here is that there's something else going on. So the law here is it's not pretext plus. It's just pretext. If we listen to the reasons given by the employer and you say, well, that just doesn't fly, that just doesn't wash, that's good enough. That's pretext. There's another example of an employee director named Peter Poitomani. Mr. Poitomani was also dealing with Jonathan Spinetto. In fact, Mr. Spinetto invited, Mr. Poitomani invited Mr. Spinetto to come all the way to the Chicago area. Mr. Spinetto then set up multiple brokerage firms there. Mr. Spinetto was asked to prepare brokerage price opinions and to even provide, I believe, some training services there. He was never licensed in Illinois. So again, Mr. Poitomani's name was provided to the investigator in this case. The investigator never contacts Poitomani, never puts him under investigation. Mr. Poitomani is never disciplined in any form or fashion. So if what my client was supposed to be doing was somehow so wrong, we have yet to hear an explanation why David Box or Peter Poitomani were not likewise disciplined. So perhaps you can say, well, they're managers, but the Code of Conduct, in particular the Conflict of Interest Code, says managers are held to a higher standard, not a lower standard. So again, the challenge here is, why weren't they punished if this was such a serious offense? Now, there's other minor issues in there. The grades, I guess the real estate brokers were given grades. If you're doing really well, you get an A. If you're not moving your properties very well, you get a B. If the properties aren't kept in proper repair, you get a C, and so forth. And so Ms. Sandage provided some of that information to Mr. Spinetto from time to time. There's testimony of the people who did it. There's no testimony that there was any harm that ever came from it. In terms of some of the people taking kickbacks, that's the implication that's created. And yet, there's never any evidence that she received any money or any benefit from Mr. Spinetto for any of this. So there's no evidence that the properties weren't properly maintained. The whole purpose of asking Mr. Spinetto to begin with is he had an excellent reputation in the industry for taking care of his properties. So there's no evidence that because he used or set up some email account or phone number so that things would be routed in a fashion that would assist the management of the properties. There's nothing improper about that. I asked Marsha Peters. She was another manager in the case. Is there any problem with one of these brokers hiring an answering service? Well, you know when you hire an answering service, the call goes to them, not to the desk of the person. And no, there's no problem with that. You don't have to ask anyone's permission to be able to do that. I mean, ultimately, the broker's going to be responsible if the answering service doesn't do things right. But that's the point is you got the contract with the brokerage, and if they go get assistance, it's perfectly fine. If they go get an accountant to access some of these computer codes, that's perfectly fine. If they get associates in their office all using the same passcode, that's apparently fine as well. So it's a situation where they're coming up with all these contrived arguments to justify something, but they're not enforcing these requirements uniformly. We've got mail managers that are doing things far worse. If there's something wrong with this program, then why isn't David Box, who signed off with Jonathan Spinetto on the propriety of this whole provision of backhaul of the service, why isn't he being held accountable? So we've never heard any good answers to that. Thank you. Thank you, Mr. Crouch. Ms. Lapinotier. I probably didn't do a very good job of pronouncing your name, so feel free to correct me. You actually did a very good job, Ms. Lapinotier. May it please the Court. Lynette Sandidge doesn't dispute that she concealed Jonathan Spinetto's involvement in the actions that ultimately led to her termination. She doesn't dispute that. The gist of her argument is that she believes that Fannie Mae's reason for initiating an both under and over the age of 40. She says that was fundamentally flawed. But that's not evidence of age or gender discrimination. That's just second-guessing Fannie Mae's business judgment. Why don't you go into those numbers for us about who was disciplined and what age or sex they were? Sure. And that is included in our briefing, Your Honor, but there is a chart that we've included in there, and what that shows is that four individuals were terminated because there was a finding that they had concealed information. Leslie Arrington was the decision maker. She was in the investigations unit. She, by the way, is a woman over the age of 40. She is within a couple of months of Ms. Sandidge's age. And what she did was when all 13, when all the investigations were done, she placed the information into buckets. If there were no policy violations, those individuals weren't disciplined. If there were policy violations, but there was no evidence that those individuals had concealed information, then they were disciplined. And there were three of those individuals. Let's see. Gina Justman is a woman over the age of 40. There was no evidence of concealment, so her employment was not terminated. Shirley Small, a woman over the age of 51. No evidence of concealment. Her employment wasn't terminated. And Brian Caprell, a male under the age of 40. No evidence of concealment, and his employment wasn't terminated. And it's important to note that Ms. Sandidge doesn't challenge the veracity of any of those investigations, all of which are included in the record. She doesn't challenge, she doesn't point to any evidence that they did conceal information and were treated differently as a result. With respect to individuals who were not terminated, who were in the first bucket, there were both men and women, both under and over the age of 40. For instance, Samir Bibi was male over the age of 40. Linda Brooks, a woman, 55 years old. She was found not viable. So with respect to termination, four individuals went into that final bucket. That's the final bucket where there were policy violations and there was a finding that they had concealed information. Three women and one man. So again, both men and women. The termination decision was based on a finding that those individuals had concealed information and as a result had violated essentially the trust of Fannie Mae. And once that's gone, you can't get that back. What Leslie Arrington said, and this is in the record at page 808, what she said in her testimony was the fact that she, Sandidge, engaged in these misrepresentations and this masking conduct in and of itself indicates that she is an employee to whom the company cannot wrest trust. And trust is an important and key component. That was her thinking when she made the determination that individuals for whom there was evidence of concealment, that their employment would be terminated. And there is substantial evidence in the record, Your Honor, that Ms. Sandidge had in fact taken steps to conceal information. There's an email that she sent to Mr. Spinetto where she had been asked to provide a file to a manager at Fannie Mae relating to a case that he was involved in, unbeknownst to Fannie Mae though, because Fannie Mae thought it was a broker of record in Montana. And what that email said was, and this is in the record at page 736, are you in any of the correspondence? Don't want her to see you at all in this when she starts digging. And the record at 701 to 702 reflects that the her being referred to there was Marsha Peters, the manager. Spinetto in response said, I need to take a look at it, I think I might be, hold off on sending it to her. And Sandidge responded in that email, okay, I'll hold off. Evidence of concealment. There's also evidence that she didn't tell Fannie Mae when non-Spinetto Montana brokers raised concerns because they thought Fannie Mae was using an outsourcer in a circumstance that Sandidge herself said was a broker's worst nightmare. That email's in the record at 658. In response to that, she told Spinetto, she didn't tell Fannie Mae. She told Spinetto that we might need to talk about how we do business in Montana. If everything was on the up and up, if there was nothing that she needed to be concealing here, why was she hiding it in this manner? That is again the issue of trust that Arrington pointed to, and that's the reason for the termination decision. Now, counsel has told you that what Spinetto's activities were, were perfectly approved by Fannie Mae, that Bach said had an opportunity to evaluate it and said, and I'm unquoting, that sounds like a great idea. He never said that. That's not in the record. What's in the record is that there was a meeting with Spinetto where Spinetto floated the concept of some sort of a consulting business, and Bach said, that sounds interesting. But Spinetto acknowledged during his deposition that he never told Bach about the key factors of this consulting thing that he had set up that were the issues that mortgage fraud investigation was focused on, and that was the phony emails and phony phone numbers that they were using to conceal their involvement with Fannie Mae. So Fannie Mae would go into Montana, for example, which was the area that Sandage was in, and under normal circumstances would contract with a broker in Montana, and that broker would be responsible for handling the REO properties in Montana in a particular region. And there were a number of policies and procedures that that individual needed to follow, and that was important to Fannie Mae because Fannie Mae, although publicly traded, was in conservatorship at the time and continues to be in conservatorship at this time, so transparency is critical. What Spinetto was doing is he was behind the scenes contracting with one of these brokers. The broker would get approved by Fannie Mae, but Spinetto would do the approval process with the assistance of Sandage and would set up a phony email and a phony phone number so that all contact would be with him, not with the broker. Sandage knew that. Fannie Mae had absolutely no idea that was happening. That undermined our audit trail with the AMN system. That undermined our trust in the community, and that created an impression with respect to the individual who was concerned about outsourcing that we were giving all of our properties. We were showing favoritism to a broker, giving them all our properties and letting them dole them out, essentially setting up a concept where you had to go through him to work with us, which was exactly the opposite of everything that we were trying to do with respect to our property. That's why mortgage fraud investigations concluded that that was not an appropriate thing. That's why mortgage fraud investigations referred individuals for investigations. They looked for individuals who had worked with them. Spinetto, in the context of Blackhawk, using these fake emails and phony phone numbers. Now, she points to Peter Poitomani as a comparator. I think it's important to note that Poitomani is actually four or five years older than her, which completely undermines the age discrimination concept of this case. More importantly, Poitomani was involved with Spinetto in Chicago with a company called Redline Realty, not Blackhawk. There were no fake emails. There were no phony phone numbers. He was an owner of Redline Realty, and that was transparent. That was in Fannie Mae's records, so it always knew who it was dealing with. There was nothing covert. The burden in this case was on Ms. Sandage to establish discrimination. That was her burden. She always had that burden. Showing that she disagreed with Fannie Mae's business judgment, or that she thinks Fannie Mae was out to get Spinetto, which she said. She said that she thinks that this was actually just a vendetta against Spinetto, and that she was just collateral damage. Saying that she believes her termination was a harsh response to her misconduct, none of that demonstrates discrimination. It doesn't meet her burden. The undisputed evidence shows that Fannie Mae had a legitimate, non-discriminatory reason for her termination, that she violated Fannie Mae's policies, and that she concealed information. She hasn't met her burden of showing that age or gender discrimination was the reason. I want to turn briefly to the remand issue here, and I want to begin by pointing out that the timing that the plaintiff has indicated, that Ms. Sandage has indicated, is critical here. The timing, I agree, is critical, but the testimony is very different. Fannie Mae became aware that this case was removable when Ms. Warren testified during Ms. Sandage's arbitration. There was an arbitration that took place the week, I believe, of September 22nd. Ms. Warren testified on September 24th of 2014. And what she said at that time was that Ms. Sandage, even if you want to assume that this so-called list existed, even if you want to assume, and there's no evidence, that there was actually a reference to specifically Ms. Sandage taking kickbacks, even if you want to assume those things, and I don't think the record does not support those when you look at it, but what Ms. Warren testified was that even if this so-called list existed, there was no way Ms. Sandage could have been on the list, in fact, because she acknowledged that her conversation about that list, that so-called list, had taken place two weeks prior to her termination. Her employment was terminated on February 1st, 2014, on a Friday. Ms. Sandage's employment was terminated the Monday before of the same week, so within four days of one another. There is no way, if that list was discussed two weeks prior, that Ms. Sandage's name could have been on that list. That shut the door to the possibility, any possibility, that anyone could come forth with any evidence of this alleged defamation claim. And I want to be clear that the record is absent, any record, any evidence of that defamation claim. But that completely shut the door, and as a result, that's when Fannie Mae knew that the case was removable. In a 28-J letter, we supplemented our authority, referring to this Court's decision in Morgan earlier this year, where the Court recognized that there are two competing interests in the removal statute. The first is to ensure prompt, proper removals, but the second is to make sure that there aren't hasty, improper removals. And what the Court said in that case is that it needs to be unequivocally clear, the evidence supporting removability needs to be unequivocally clear that removal is proper. That testimony is what made it unequivocally clear. That testimony was on September 24, 2014. We received the transcript on October 17, 2014, and we filed our supplemental notice 24 days later, well within the time frame under the statute. The remand was not untimely, and the remand or excuse me, the supplemental notice was timely, and Donovan was fraudulently joined. There is no evidence that he engaged in any sort of defamatory conduct. There are no further questions. We respectfully ask that this Court affirm the trial court's judgment. All right. Thank you, Ms. LaFontiere. Mr. Crouch, you've saved time for the vote. So there has been a suggestion that my client has improperly concealed things from her manager. The problem with that argument is Marsha Peters was not her manager. Marsha Peters was another employee at Fannie Mae, not my client's manager. Marsha Peters was known to personally dislike Mr. Spinetto. The reason for removing the reference to Mr. Spinetto was because Marsha Peters was known to dislike Mr. Spinetto. So there's no evidence that there was an attempt by my client to conceal it from, I think Mr. Cordova was the name of her manager. But at any rate, it wasn't Ms. Peters. Well, let's just assume that her termination was just unfair, it was based on the wrong factors, whatever. How does this record tell us anything, though, about age or sex discrimination? So, again, my opposing counsel is trying to lure the Court impermissibly into a wrong standard. The old standard before Reeves was pretext plus. You have to show pretext, and then you have to show... Why don't you answer my question, which is, tell us what there is in this record that indicates that this termination was on the basis of age or sex, in light of the fact that actions were taken against other employees, both above and below 40, and both male and female. If I show pretext, pretext creates an inference of fact that there was discrimination. So I can point to employees who were doing or setting an example that is evidence of pretext and were not disciplined. For example, the testimony with regard to Mr. Box. Mr. Box sits down with Mr. Spinetto. Mr. Box hears this business plan. Mr. Box gives his consent. There's some dispute as to whether all the details were disclosed, but Mr. Spinetto was very clear that it was very obvious from the description of what he had planned that sharing AMN, their computer access information, was clearly contemplated by it. Mr. Box is not disciplined. So I think the jury can reasonably infer from that, if it's okay for Mr. Box, it's somehow not okay for Ms. Sandage, that's discrimination. And the argument that, well, Mr. Box is different because he's a vice president, well, if you go and you look at the particular policy document that they say was violated, the conflict of interest, it says that a vice president, an officer, is supposed to be held to a higher standard, not a lower one. So if this is something that was expressly approved by Mr. Box that gets this whole thing going, if there is evidence that there was no training on improper, there's no training that using an answering service is improper, if there's no training that using an email address that will automatically forward things to Mr. Spinetto because that will help him handle the properties faster, there's no training that any of that is improper, the jury can infer that this is a pretextual argument. And the fact that all of this was set in motion by a white male, Mr. David Box, who is younger, that is evidence that this vendetta against Mr. Spinetto is what's going on here. There is evidence that when you start pairing up what's happening with the employees, that there is a disparity based on gender. Again, Mr. Caperell was doing the same thing, working with Mr. Spinetto. Mr. Caperell was reported at the same time that my client was investigated, and that report of wrongdoing just sat there for a year. Mr. Caperell was sending messages or telling my client, well, I don't get why you were fired, and Ms. Small was reprimanded, and Ms. Warren was fired. Nothing happened to me, I did the same thing. This is Caperell you're talking about? Yes, Brian Caperell. He was found not to have concealed his actions though, isn't that right? In theory, after they finally investigated him, after a year, because of the lawsuit, because we kept pointing to him as an exemplar, but he was reported when they sat down with my client. They just didn't do anything because he's a male. That's the point. That's your evidence of discrimination. There may have been other things going on with Mr. Spinetto, but the point is, when they go to cutting people out, they're discriminating in terms of who they get rid of, and they're certainly not holding some of these male managers that were right in the center of this exhibiting the same conduct, so that my client didn't realize there was some policy violation or alleged policy violation going on here. All right. Thank you, Mr. Crouch. Your case is under submission. Thank you, Your Honors.